IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| ASHLEY LEWIS, M.D., | ) |
| Plaintiff, | ) |
| v. | ) Case No. |
| UNIVERSITY OF KANSAS, SCHOOL OF MEDICINE, | ) |
| Defendant. | ) |

# COMPLAINT

The plaintiff, Ashley Lewis, M.D., for her claim for relief against the defendant, states and alleges the following:

## JURISDICTION AND VENUE

1. This is a discrimination case based upon and arising under Title VI and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq.

2. This court has subject matter jurisdiction over the plaintiff's federal claims pursuant to 28 U.S.C. § 1331, since these claims arise under federal statutory law.

3. All of the unlawful acts and practices set forth below were committed within the State of Kansas, and venue is proper in this court pursuant to 28 U.S.C. § 1391(b)-(c).

## PARTIES

4. The plaintiff, Ashley Lewis, M.D., is a Black former psychiatry residency student at the University of Kansas, School of Medicine. Dr. Lewis is a citizen and resident of Antioch, Tennessee.

5. The defendant, University of Kansas, School of Medicine ("KU School of Medicine") is a state-supported educational institution, whose main campus is located in Kansas City, Kansas. The KU School of Medicine receives federal education financial assistance.

6. Some of Dr. Lewis' claims were included in a timely administrative charge filed with the Equal Employment Opportunity Commission ("EEOC"). The EEOC issued a right-to-sue letter to Dr. Lewis, regarding these claims, and this action was filed within 90 days after her receipt of the right-to-sue letter.

## FACTUAL ALLEGATIONS

7. In January of 2020, Dr. Lewis joined the KU School of Medicine's Psychiatry Residency Program, which is based in Wichita, Kansas. While she was in the residency program, Dr. Lewis was both an employee and a student of the KU School of Medicine.

8. In the residency program, Dr. Lewis was the only, or one of the few, Black doctors in her class.

9. At the beginning of her residency, Dr. Lewis was often commended for going above and beyond for patients and was even told she was "very friendly and nice." She was told that she was a pleasure to work with.

10. About a month later, things changed drastically. Dr. Lewis was working with a medical student. Dr. Lewis assigned the student the task of calling a patient. The student left a message and provided Dr. Lewis' personal phone number, rather than the student's number. Dr. Lewis texted the student and explained how she would like that handled in the future. The student was extremely upset and spoke with several staff members about the incident. Although Dr. Lewis did not think much of this incident, this incident seemed to changed everything.

11. After this incident, Dr. Lewis was falsely labeled as an aggressive, intimidating, unprofessional, and argumentative psychiatric resident who could not be instructed. These terms are often associated with a stereotype of Black women. They are often stigmatized as being angry or aggressive by default whenever they disagree with a norm. This stigma extends to the workplace. "At any educational or professional success, Black women are subjected to the pressures of being persuaded to be quieter and compliant." Daphna Motro, Jonathan B. Evans, Aleksander P.J. Ellis, Lehman Benson III, *The "Angry Black Woman" Stereotype at Work*, Harvard Business Review (Jan. 31, 2022). The article further explains,

> Studies show people in organizations believe Black women are more likely to have belligerent, contentious, and angry personalities, an assumption not as readily assigned to other men and women. Recent studies suggest this negative perception is a unique phenomenon for Black women, and the researchers suggest that when Black women outwardly express anger at work, her leadership and potential are called into question.

12. And after this incident, Dr. Lewis saw a shift in the way the KU School of Medicine, particularly Dr. Connie Marsh, M.D., started to treat her, namely, in a racially discriminatory manner. Dr. Marsh is the Associate Medical Director of Senior Behavioral Health at the School of Medicine.

13. This pattern of racially discriminatory conduct by the KU School of Medicine against Dr. Lewis began in February 2020, and continued until she left the program.

14. On many occasions, Dr. Marsh verbally harassed Dr. Lewis for offenses that she did not commit. This verbal harassment would happen in front of her peers and other coworkers. For example, Dr. Marsh accused Dr. Lewis of not submitting patient notes and patient orders on time, even though they were submitted on time.

15. On another occasion, Dr. Marsh verbally abused Dr. Lewis, and told her she was not clinically competent.

16. As early as February 17, 2020, Dr. Lewis was forced into having a mentor. Dr. Carr agreed to be Dr. Lewis' mentor and they came up with a list of things Dr. Lewis could do to "tone herself down to fit in here."

17. The KU School of Medicine then made Dr. Lewis complete an improvement plan, which included having a mentor, meeting with a coach, and reading a book about communication. No other residency student was subjected to this treatment.

18. On February 19, 2022, Dr. Lewis sent an email to the PD/coordinator regarding concerns she had. Dr. Lewis stated:

> I feel there is a problem with me constantly being reported to the PD (Dr. Mac) before I am alerted one time there is a concern. I am worried this is going to continue to happen. I'm not sure how to protect myself in these instances because it may be happening because of certain biases others have? Also how about the informal meeting of me being introduced to the faculty. Because for some all they know of me are the complaints and I don't think that is an accurate representation of me. I believe I am being treated different by some faculty because they have a skewed idea of who I am.

19. On February 20, 2022, Dr. Lewis' attending physician, Dr. Ciccolari-Micaldi, told her that "your overall personality is aggressive." Dr. Lewis felt that she was walking on eggshells around Dr. Cirrolari-Micaldi.

20. Dr. Lewis was told she was doing well and was hard working. But Dr. Ciccolari-Micaldi told Dr. Lewis that she is aggressive and intimidating.

21. On March 4, 2020, Dr. Ciccolari-Micaldi told Dr. Lewis that she would be reporting her. She went on to lecture Dr. Lewis that she argues her point and gets defensive.

22. Each week, Dr. Lewis and Dr. Carr met and discussed her issues and how she could improve. But Dr. Ciccolari-Micaldi continued to be passive aggressive toward Dr. Lewis.

23. On March 10, 2020, Dr. Lewis reached out to Dr. Lochmann and asked to be separated from supervision by Dr. Ciccolari-Micaldi. Dr. Lochmann discussed the situation with

4

Dr. Brown and Dr. Macaluso to see what could be done.  However, Dr. Lochmann said there was nothing that could be done.  Dr. Lochmann told Dr. Lewis, "if you can remain in the emergency department (ED), please do so. But if you cannot, then we can excuse you from the rotation until something can be figured out, but we currently do not have any other options for coverage of the ED."  In this instance, Dr. Lewis felt like the staff began painting the picture as if she was the problem and that her days were numbered at the KU School of Medicine.

24. Dr. Lewis did not receive any academic credit for the month of March, 2020.

25. Dr. Lewis continued to experience racial discrimination. This was evidenced by her receiving disparate, negative treatment compared to her white colleagues. For example, Alex Beugelsdijk, M.D., another psychiatric resident at the KU School of Medicine, consistently had problems with patient notes. Dr. Beugelsdijk's issues had to be corrected by his attending physician.  This is an infraction that should cause a residency program concerns that would merit some type of disciplinary action.  However, Dr. Beugelsdijk is a white male and was never reprimanded for his mistakes.

26. Other psychiatry residents consistently asked Dr. Lewis for help with their patient orders and patient differentials, which she always provided. And when Dr. Lewis helped Dr. Beugelsdijk with his patient notes, there were no issues with his patient orders, patient differentials, or patient notes.

27. The KU School of Medicine has a pattern of discriminating against racial minorities. Dr. Lewis was informed by the staff, specifically a secretary named Kim, that Dr. Marsh places anyone who is a racial minority on probation.

28. The discriminatory conduct to which Dr. Lewis was subjected was allowed to take place because of the Program Director of the School of Medicine's Psychiatry Residency Program,

Dr. Matthew Macaluso, D.O. Unlike any other resident, during February, March, and April of 2020, Dr. Lewis had to meet twice a week with Dr. Macaluso who reprimanded her for minor infractions.

29. During these meetings, Dr. Macaluso indicated that faculty members had been complaining about Dr. Lewis. Dr. Lewis wanted to be proactive and asked Dr. Macaluso if she could meet with the faculty members who had complained about her, so she could address the faculty's concerns directly. Dr. Macaluso told Dr. Lewis that she was only going to bring problems onto herself if she chose to pursue meeting with the faculty.

30. On May 12, 2020, Dr. Lewis received a notification letter that she was on probation. This is an adverse action that was recorded on Dr. Lewis' permanent record, which likely will be reviewed when she applies for research positions, fellowships, or jobs as a physician. This action likely will have serious consequences on Dr. Lewis' intended career goals. But the probation was based off of false accusations.

31. Dr. Lewis knew the probation was wrong. She appealed her probation and attempted to convey why the accusations against her were incorrect. But the program continued to ignore her arguments and denied her appeal.

32. The probation letter accused Dr. Lewis of ordering an incorrect medication. But this accusation is false. Dr. Lewis ordered the correct medication after following up with the pharmacist. At no point was the patient given or administered incorrect medication. Dr. Lewis provided a copy of the relevant documentation that shows she did not commit the alleged offense.

33. Additionally, the letter accused Dr. Lewis of putting incorrect information in a patient discharge summary. This accusation is also false. Dr. Lewis included all correct

6

information for the patient's discharge summary. Dr. Lewis provided a copy of the relevant documentation that shows she did not commit the offense alleged.

34. Dr. Lewis was also accused of writing an incomplete patient note on May 5, 2020. This is false. The attending physician only saw a draft of the patient note that Dr. Lewis was working on. The draft was not finalized nor completed. The attending physician prematurely disciplined Dr. Lewis without offering her a chance to explain.

35. Lastly, the probation letter accused Dr. Lewis of not including the correct diagnosis on a patient's notes. This is also false. Dr. Lewis correctly listed the patient's diagnosis as Bipolar Disorder. Dr. Lewis provided a copy of the relevant documentation that shows she did not commit the alleged offense.

36. But Dr. Lewis' discriminatory treatment continued. On May 20, 2020, Dr. Marsh accused Dr. Lewis of not knowing the correct information regarding dementia. Although Dr. Lewis provided Dr. Marsh with the correct information, she had memorized the night before, Dr. Marsh denied that Dr. Lewis was right. But Dr. Marsh took a step further. She filed a written reprimand against her, despite the fact that Dr. Lewis had provided Dr. Marsh with the correct, requested information.

37. Also in May of 2020, Dr. Lewis did a rotation that was similar or identical to the rotation she did in January of 2020. Dr. Lewis passed her rotation in January with "flying colors" however, the program failed her for her May 2020 rotation. Dr. Lewis never received an explanation for why her May 2020 rotation was deemed "failed."

38. This discriminatory behavior escalated to different areas of the hospital. As recently as May 21, 2020, pharmacists at the KU School of Medicine did not follow up with Dr. Lewis regarding her patient orders for medications. This resulted in patients missing their necessary

medications. It also resulted in adverse actions against Dr. Lewis. Dr. Lewis was reprimanded for the fact that pharmacists did not correspond with her regarding patient medications.

39. Another resident in the program, Dannette Napier, D.O., began to administer double the dose of lithium to a patient despite the attending physician's order specifically prescribing a single dose of lithium. Dr. Napier was supposed to administer 300 mg of lithium to the patient twice a day. Instead, she administered 600 mg of lithium twice a day to the patient. Dr. Napier was not disciplined for this serious dereliction of duty. This is disparate treatment because Dr. Lewis had been reprimanded for initially ordering an incorrect medication, despite the fact that she immediately corrected the order and the incorrect medication was never given to Dr. Lewis' patient.

40. The KU School of Medicine has also required Dr. Lewis to take additional tests to prove her clinical competency in psychiatry. The tests were ordered and approved by Dr. Macaluso, despite the lack of evidence that the tests were warranted. No other residents were required to take these additional tests.

41. Dr. Lewis was also reprimanded for arriving to the hospital late on two occasions. However, Peter Mehta, M.D., another resident with the program, consistently arrived late but was never reprimanded.

42. Dr. Marsh disciplined Dr. Lewis for not completing her patient notes by 5:00 p.m., but allowed another resident to submit his patient notes by 11:00 p.m. without any discipline.

43. But Dr. Lewis did not sit in silence. Dr. Lewis expressed her concerns of a racially hostile work environment to both Mike Parmley, Residency Program Coordinator, and Rachel Brown, M.B., B.S., Chairperson of the KU School of Medicine's Psychiatry Department.

However, neither individual followed up on her concerns, but instead dismissed her concerns, and even verbally berated Dr. Lewis for raising the concerns.

44. Dr. Lewis also opposed, both formally and informally, what she in good faith believed to be racial discrimination. Her opposition to racial discrimination included filing a charge of discrimination with the EEOC against the KU School of Medicine on or about July 24, 2020.

45. On or about November 20, 2020, Dr. Lewis resigned as an employee and a student of the KU School of Medicine. Based on all the race-based actions taken against her, Dr. Lewis believed that she had no other choice but to resign.

46. The KU School of Medicine's psychiatric residency program is a two-year program. As a result of her involuntary resignation from the program, Dr. Lewis did not receive any academic credit for her participation in the program.

## COUNT I: HOSTILE ENVIRONMENT

47. Paragraphs 1 through 46 are incorporated as though fully set forth in Count I.

48. The KU School of Medicine subjected Dr. Lewis to a hostile, intimidating, and offensive work and education environment based on her race. The racial hostility toward Dr. Lewis was severe and persuasive, and it deprived her of access to employment and educational benefits.

49. In subjecting Dr. Lewis to a hostile work and education environment, the KU School of Medicine acted intentionally and/or with deliberate indifference, in violation of Title VI and Title VII.

50. As a result of the hostile work and education environment to which she was subjected, Dr. Lewis has suffered damages in the form of loss of compensation, emotional distress, mental anguish, and loss of enjoyment of life.

WHEREFORE, Dr. Lewis prays for judgment against the KU School of Medicine for damages in excess of $100,000.00, consisting of loss of compensation, emotional distress, mental anguish, and loss of enjoyment of life, plus an award of attorney fees, litigation expenses, and for such other and further relief as the Court deems proper.

## COUNT II: RACIAL DISCRIMINATION

51. Paragraph 1 through 51 are incorporated as though fully set forth in Count II.

52. The KU School of Medicine discriminated against Dr. Lewis by taking adverse actions against her because of her race.

53. In discriminating against Dr. Lewis because of her race, the KU School of Medicine acted intentionally and/or with deliberate indifference, in violation of Title VI and Title VII.

54. As a result of the racial discrimination to which she was subjected, Dr. Lewis has suffered damages in the form of loss of compensation, emotional distress, mental anguish, and loss of enjoyment of life.

WHEREFORE, Dr. Lewis prays for judgment against the KU School of Medicine for damages in excess of $100,000.00, consisting of loss of compensation, emotional distress, mental anguish, and loss of enjoyment of life, plus an award of attorney fees, litigation expenses, and for such other and further relief as the Court deems proper.

## COUNT III: RETALIATION

55. Paragraphs 1 through 54 are incorporated as though fully set forth in Count III.

56. The KU School of Medicine retaliated against Dr. Lewis by taking adverse actions against her because she opposed what she in good faith believed to be racial discrimination.

57. In retaliating against Dr. Lewis because of protected opposition to racial discrimination, the KU School of Medicine acted intentionally and/or with deliberate indifference, in violation of Title VI and Title VII.

58. As a result of the retaliation to which she was subjected, Dr. Lewis has suffered damages in the form of loss of compensation, emotional distress, mental anguish, and loss of enjoyment of life.

WHEREFORE, Dr. Lewis prays for judgment against the KU School of Medicine for damages in excess of $100,000.00, consisting of loss of compensation, emotional distress, mental anguish, and loss of enjoyment of life, plus an award of attorney fees, litigation expenses, and for such other and further relief as the Court deems proper.

## COUNT IV: CONSTRUCTIVE DISCHARGE

59. Paragraphs 1 through 58 are incorporated as though fully set forth in Count IV.

60. Because of Dr. Lewis' race, the KU School of Medicine subjected her to a hostile work and education environment, discriminated against her, and retaliated against her. Based on all of these race-based actions against her, Dr. Lewis resigned as an employee and a student of the KU School of Medicine, because she believed that she had no other choice but to resign. Accordingly, Dr. Lewis' resignation amounted to a constructive discharge.

61. In constructively discharging Dr. Lewis, the KU School of Medicine acted intentionally and/or with deliberate indifference, in violation of Title VI and Title VII.

62. As a result of her constructive discharge, Dr. Lewis has suffered damages in the form of loss of compensation, emotional distress, mental anguish, and loss of enjoyment of life.

WHEREFORE, Dr. Lewis prays for judgment against the KU School of Medicine of damages in excess of $100,000.00, consisting of loss of compensation, emotional distress, mental

anguish, and loss of enjoyment of life, plus an award of attorney fees, litigation expenses, and for such other and further relief as the Court deems proper.

Respectfully submitted:

SLOAN, EISENBARTH, GLASSMAN,
    MCENTIRE & JARBOE, L.L.C.
534 S. Kansas Ave, Suite 1000
Topeka, KS 66603-3456
Office:  (785) 357-6311
Fax:     (785) 357-0152

BY:   s/ Alan V. Johnson
    Alan V. Johnson, KS # 9992

BY:   s/ Rebecca M. Henderson
    Rebecca M. Henderson, KS #28955
    **ATTORNEYS FOR PLAINTIFF**

**REQUEST FOR TRIAL BY JURY**

Pursuant to Fed. R. Civ. Pro. 38, the Plaintiff requests a trial by jury on all claims triable to a jury.

Respectfully submitted:

SLOAN, EISENBARTH, GLASSMAN,
    MCENTIRE & JARBOE, L.L.C.
534 S. Kansas Ave., Suite 1000
Topeka, KS 66603-3456
Office: (785) 357-6311
Fax:    (785) 357-0152


BY: \_\_s/\_Alan V. Johnson_____
    Alan V. Johnson, KS #09992
    Rebecca M. Henderson, KS #28955
    **ATTORNEYS FOR PLAINTIFF**

## **DESIGNATION OF PLACE OF TRIAL**

Plaintiff requests that Kansas City, Kansas, be designated as the place of trial in the above captioned matter.

Respectfully submitted:

SLOAN, EISENBARTH, GLASSMAN,
    MCENTIRE & JARBOE, L.L.C.
534 S. Kansas Ave., Suite 1000
Topeka, KS 66603-3456
Office:  (785) 357-6311
Fax:     (785) 357-0152


BY:__s/__Alan V. Johnson_____
    Alan V. Johnson, KS #09992
    Rebecca M. Henderson, KS #28955
    **ATTORNEYS FOR PLAINTIFF**